[No. 29643. Department Two. August 30, 1946.]

CHESTER A. BATCHELOR et al., Respondents, v. MADISON PARK CORPORATION et al., Respondents, THE CITY OF SEATTLE, Cross-appellant, LEIPHY C. McGEE et al., Appellants.[1]

[1]Reported in 172 P. (2d) 268.

908

*Brethorst, Holman, Fowler & Dewar,* for appellants McGee *et al.*

*A. C. Van Soelen* and *J. Ambler Newton,* for cross-appellant city of Seattle.

*The Attorney General, R. Paul Tjossem* and *Lucile Lomen, Assistants,* for respondent state of Washington.

*Charles Stone,* for respondents Fisher.

ROBINSON, J.—The decree appealed from was entered in February, 1945. The action, however, was begun in December, 1940, by Chester A. Batchelor and wife against Madison Park Corporation, the city of Seattle, Joseph E. Wickstrom and Leiphy C. Wickstrom, his wife (now Mrs. McGee), Clara Mae Owens, the state of Washington, and Albert C. Martin, as state land commissioner. In due course, Progressive Jack Taylor was substituted for Martin, as his successor in office, and Clara Mae Owens was dismissed.

During the first two years and three months of the pendency of the action, the parties thereto intermittently interpleaded and cross-complained against each other. The Wickstroms' answer and cross-complaint was especially comprehensive, being twelve pages in length and praying for more than a dozen species of relief, including, among other things, that chapter 157, Laws of 1939, be declared unconstitutional; that a deed to the city of Seattle be declared void; that certain new boundary lines be established; that they be granted judgment for damages against the city of Seattle for appropriating an easement, and against Madison Park Corporation for the same reason; that they be granted certain injunctive relief against the city of Seattle and its park commissioners; that the city be enjoined from

spending public funds for certain purposes; and that the Madison Park Corporation be required to remove certain of its fences and buildings. There were other prayers, but those we have mentioned will, we think, be sufficient to show that this pleading converted the action into an extremely complicated lawsuit.

But the pleading did not cease at that point. On March 7, 1944, the attorney for the Wickstroms filed a petition for intervention on behalf of the Fishers, and it was granted. Their answer and complaint in intervention gives a fairly adequate idea of the pleadings on file at that date. It opens by admitting twenty-six paragraphs of the Batchelors' complaint. In answer to the "Answer and Cross-Complaint of the defendant Progressive Jack Taylor," it admits everything alleged therein against the defendant, the city of Seattle. In answer to the "City of Seattle's Answer to the Amended Cross-Complaint of the Defendant State of Washington and Jack Taylor," it denies everything affirmatively alleged in the city of Seattle's answer thereto. In answer to the "Affirmative Defense and Cross-Complaint of the defendants Joseph E. Wickstrom" and his then wife, it admits "all of the allegations, statements and things contained in paragraphs (A), (B), (C), (D), (E), (F), (G), (H), (I); (J), (K), (L), (M), (N), (O) and (P) thereof" and in answer to the "Reply and Answer of the defendant Madison Park Corporation to the Affirmative Defense and Cross-Complaint of the defendants Wickstrom and wife," it denies everything affirmatively therein contained, and then goes on to allege, "by way of Affirmative Defense to the aforesaid Complaint" and all other beforementioned pleadings (although none of them had mentioned the interveners or sought any kind of relief against them), thirteen paragraphs of affirmative matter, one of them having eleven subparagraphs. This was followed by five miscellaneous prayers for relief.

This Fisher intervention served only to confuse an already hopelessly confused situation. So far has this case departed from its original purpose that we are besought to determine the location of government meander lines, and

on inadequate evidence, as well as to allow damages against the city of Seattle for appropriating an easement and to order the Madison Park Corporation to take down a fence. Obviously, it would be impossible to discuss all the questions raised by this wilderness of pleadings. We will endeavor to deal with those properly in the case which have merit or the semblance thereof.

Chapter 157, pp. 457, 458, 459, Laws of 1939 (Rem. Rev. Stat. (Sup.), §§ 7993-1, -2, -3,), the constitutionality of which is attacked on nine or ten alleged grounds, reads as follows:

"AN ACT relating to the conveyance of state owned tide or shore lands to cities and towns and metropolitan park districts for municipal park and/or playground purposes and the securing of the same where necessary by exchanging state owned tide or shore lands therefor and authorizing the Director of Conservation and Development to assist in the development and decoration thereof.

*"Be it enacted by the Legislature of the State of Washington:*

"Section 1. Whenever application is made to the Commissioner of Public Lands by any incorporated city or town or metropolitan park district for the use of any state owned tide or shore lands within the corporate limits of said city or town or metropolitan park district for municipal park and/or playground purposes, he shall cause such application to be entered in the records of his office, and shall then forward the same to the Governor, who shall appoint a committee of five (5) representative citizens of said city or town, in addition to the Commissioner of Public Lands and the Director of Conservation and Development, both of whom shall be ex-officio members of said committee, to investigate said lands and determine whether they are suitable and needed for such purposes; and, if they so find, the Land Commissioner shall certify to the Governor that the property shall be deeded to the said city or town or metropolitan park district and the Governor shall then execute a deed in the name of the State of Washington, attested by the Secretary of State, conveying the use of such lands to said city or town or metropolitan park district for said purposes for so long as it shall continue to hold, use and maintain said lands for such purposes.

"Sec. 2. In the event there are no state owned tide or shore lands in any such city or town or metropolitan park

district suitable for such purposes and the committee finds other lands therein which are suitable and needed therefor, the Commissioner of Public Lands is hereby authorized to secure the same by exchanging state owned tide or shore lands in the same county of equal value therefor, and the use of the lands so secured shall be conveyed to any such city or town or metropolitan park district as provided for in section 1 of this act. In all such exchanges the Commissioner of Public Lands shall be and he is hereby authorized and directed, with the assistance of the Attorney General, to execute such agreements, writings, relinquishments and deeds as are necessary or proper for the purpose of carrying such exchanges into effect. Upland owners shall be notified of such state owned tide or shore lands to be exchanged.

"Sec. 3. The Director of Conservation and Development in addition to serving as an ex-officio member of any such committee, is hereby authorized and directed to assist any such city or town or metropolitan park district in the development and decoration of any lands so conveyed and to furnish trees, grass, flowers and shrubs therefor."

The city of Seattle made application to the state land commissioner for a conveyance of certain lands for park and/or playground purposes. A committee was appointed, pursuant to the provisions of the statute, to make an investigation and to determine whether or not the property was suitable and needed for park and/or playground purposes. The committee, by a vote of five to two, determined that they were, the two ex-officio members, state land commissioner and director of conservation and development, voting against the determination. Thereafter, the land commissioner certified to the governor that the city was entitled to a conveyance of certain of the lands applied for, and on September 11, 1939, a deed was issued, signed by the governor and attested by the secretary of state, conveying to the city the use of the following lands:

Lots 1, 3, 4, 5, 19, 20, and 21, block 24, and lots 1 to 6, inclusive, and the north 40 feet of lot 7, block 25, replat of blocks 24 and 25, Lake Washington shorelands,

for park and/or playground purposes. The deed contained the following restrictions and reversionary clause:

."The use of these shore lands is hereby granted to the City of Seattle to be used for municipal park and/or playground purposes only and this deed shall remain in full force and effect only for such period that the said City of Seattle shall continue to hold, use and maintain said lands for such purposes. In case the said City of Seattle shall cease to use the land for such purposes, or permit their use, or any portion thereof, for any other purposes, the same shall forthwith revert to the State of Washington without suit, action or other proceedings whatsoever, or the judgment of any court forfeiting the same.

"The above reversionary clause shall be invoked if the use of the lands for municipal park and/or playground purposes is not commenced within one year from the date of this deed."

The city, by ordinance, accepted the conveyance and transferred the management of the property to its board of park commissioners.

This action was instituted in January, 1940, by plaintiffs Batchelor, alleging that they were the owners of lots 6 and 7, block 24, replat of blocks 24 and 25, Lake Washington shorelands. The object of the suit was to obtain an annulment of the deed to the city, on the grounds that chapter 157, Laws of 1939, was unconstitutional; that the property was not suitable or needed by the city for park or playground purposes; that the establishment of a park or playground on any of the property, and especially on lots 1, 3, 4, and 5, block 24, would constitute a nuisance and cause irreparable damage to them; and that the city purposed to turn over lots 1, 3, 4, and 5, block 24, to the exclusive use of Madison Park Corporation.

In January, 1941, the state land commissioner filed a cross-complaint against the city, the object of which was to obtain a forfeiture of the rights of the city, on the ground that the city had failed to use the property for park or playground purposes within the one-year period following the issuance of the deed. An amended complaint was subsequently filed by the state and the state land commissioner, the object of which was the same as that of the original cross-complaint filed by the commissioner.

In November, 1941, the Wickstroms filed a cross-complaint against the city and the Madison Park Corporation, alleging that they were the owners of lots 8, 9, and 10, block 24, replat of blocks 24 and 25, Lake Washington shorelands. The object of this cross-complaint was to obtain an annulment of the deed on the same grounds alleged by plaintiffs in their complaint, namely, that chapter 157, Laws of 1939, was unconstitutional; that the property was not suitable or needed for park or playground purposes; that the establishment of a park or playgrounds on any of the property, and particularly on lots 1, 3, 4, and 5, block 24, would constitute a nuisance and cause irreparable damage to them; and that the city purposed to turn over lots 1, 3, 4, and 5, block 24, to the exclusive use of the Madison Park Corporation. Certain other matters were alleged in this cross-complaint, and relief was sought against the city and the Madison Park Corporation, which will be noticed later.

In March, 1944, the Fishers intervened and filed a cross-complaint against the city and the state land commissioner, alleging that they were the owners of lot 7, except the north forty feet thereof, block 25, replat of blocks 24 and 25, Lake Washington shorelands. The object of this suit was to obtain an annulment of the deed to the city on the same grounds as those alleged in plaintiffs' complaint and in the cross-complaint of the Wickstroms, and also on the ground that the city had failed to use the property for park or playground purposes within the one-year period following issuance of the deed. Certain relief was also sought against the state land commissioner and the state of Washington, which we will not notice on this appeal.

The case was tried in April, 1944. September 6, 1944, the trial judge filed a memorandum opinion announcing his decision that the city had not commenced the use of the property for park or playground purposes within the one-year period following issuance of the deed, and that thereby the city had forfeited its rights in the property. On February 9, 1945, a decree was entered which, omitting the formal parts, is as follows:

"Now, therefore, in conformity with said decision, IT IS

HEREBY ORDERED, ADJUDGED and DECREED that the lands described in the plaintiffs' complaint, to-wit: Lots One (1), Three (3), Four (4), Five (5), Nineteen (19), Twenty (20) and Twenty-one (21), Block Twenty-four (24) and Lots One (1) to Six (6), inclusive, and the north 40 feet of Lot Seven (7), Block Twenty-five (25) of the Replat of Blocks Twenty-four (24) and Twenty-five (25), Lake Washington shore lands, as shown on the official plat thereof on file in the office of the Commissioner of Public Lands at Olympia, Washington, which lands were, on the 11th day of September, 1930, by deed recorded in Volume 1862 of Deeds, page 347, of the records of the Auditor of King County, Washington, conveyed by the State of Washington to the City of Seattle for municipal park and/or playground purposes, have reverted to the State of Washington, and that all right, title and interest of the City of Seattle in and to said property, and all of it, has been and hereby is decreed to be forfeited and terminated.

"IT IS FURTHER ORDERED, ADJUDGED and DECREED that there has been no interference with the easement rights of the defendants and cross-complainants Wickstrom which would entitle said defendants and cross-complainants to compensation, and said cross-complaint is hereby dismissed.

"IT IS FURTHER ORDERED, ADJUDGED and DECREED that all questions as to a disputed boundary line between shoreland Lots Five (5) and Six (6) involving the plaintiffs or any other parties to this litigation, and all questions as to damages suffered by the plaintiffs through the obstruction of access to the plaintiffs' property were by consent of the parties to this action withdrawn from the consideration of the Court at the commencement of the trial of this cause. Upon stipulation of counsel no costs will be allowed."

The city of Seattle, Wickstrom, and Mrs. McGee have appealed, Wickstrom and Mrs. McGee designating themselves as appellants, and the city designating itself as cross-appellant. Since the entry of the decree, the legislature has enacted Laws of 1945, chapter 26, p. 53 (Rem. Supp. 1945, § 7993-10). Section 1 reads as follows:

"Notwithstanding the condition contained in the deed recorded in volume 1862 of Deeds, page 347, records of King County, Washington, executed pursuant to the provisions of section 1, chapter 157, Laws of 1939 (section 7993-1, Remington's Revised Statutes), whereby the use of the herein-

after described Lake Washington shorelands should revert to the State of Washington after the lapse of one (1) year of non-user by the grantee, the use of the following described property, to-wit: Lots One (1), Three (3), Four (4), Five (5), Nineteen (19), Twenty (20) and Twenty-one (21) of Block Twenty-four (24) and Lots One (1) to Six (6), inclusive, and the North Forty (40) feet of Lot Seven (7), Block Twenty-five (25) of the Replat of Blocks Twenty-four (24) and Twenty-five (25), Lake Washington shorelands, according to the plat thereof as recorded in the office of the Auditor of King County and the office of the Commissioner of Public Lands at Olympia, Washington, is hereby confirmed in the City of Seattle as long as it shall continue to hold, use and maintain such property for municipal park and/or playground purposes."

The property described in that section is the very property with which we are concerned, or perhaps, speaking more accurately, the property with which this action was originally concerned. It would seem that this act has disposed of the principal questions raised upon this appeal. The city so contends, and asks us to hold that this action is entirely moot. This position is stoutly opposed by the attorney general and by almost all other counsel in the case. As it appears that there are other cases pending in which the constitutionality of chapter 26, Laws of 1945, is questioned, and we have reached the conclusion that the rights granted to the city by the state's deed of September 11, 1939, did not, and could not, *automatically* revert to the state, we will decide this case without relying upon the 1945 act. We requote the following provision from the deed to the city:

"The above reversionary clause shall be invoked if the use of the lands for municipal park and/or playground purposes is not commenced within one year from the date of this deed."

■ This language is said to have been inserted in the deed at the suggestion of the then land commissioner. Certainly, nothing in chapter 157, Laws of 1939, authorized any such a provision, and we know of no general power vested in the governor or the land commissioner that would authorize

them to insert it. It is plainly in derogation of the legislative grant, and, therefore, void. *Treasurer & Receiver General v. Revere Sugar Refinery,* 247 Mass. 483, 142 N. E. 909; *Hughes v. Thornton,* 155 Minn. 432, 193 N. W. 723.

The statute does say that a deed shall be issued

" . . . conveying the use of such lands to said city or town or metropolitan park district for said purposes for so long as it shall continue to hold, use and maintain said lands for such purposes." [Laws of 1939, p. 458.]

■ This authorizes the "use" to be conveyed, subject to forfeiture for breach of a condition subsequent; but courts of equity abhor forfeitures and will not enforce a forfeiture unless justice imperatively requires such action. *Central Christian Church v. Lennon,* 59 Wash. 425, 428, 109 Pac. 1027; *Income Properties Inv. Corp. v. Trefethen,* 155 Wash. 493, 505, 284 Pac. 782; 2 Pomeroy's Equity Jurisprudence (5th ed.) 318, § 460a.

■ Furthermore, the rights granted by the state cannot be forfeited at the suit of any individual. No one, other than the state, can maintain a suit to forfeit the city's rights under the instrument. See *Spokane & B. C. R. Co. v. Washington & G. N. R. Co.,* 219 U. S. 166, 55 L. Ed. 159, 31 S. Ct. 182, affirming the decision of this court in 49 Wash. 280, 95 Pac. 64.

In that case, the Congress of the United States granted a right of way through the Colville Indian reservation to a railroad company, providing that it should be forfeited by such company unless twenty-five miles of railway should be constructed within the reservation within two years of the passage of the act. This court found, as a fact, that the twenty-five miles of railway was not constructed within two years, but refused to forfeit the right. The supreme court of the United States, in affirming that decision, said that the leading case on the subject was *Schulenberg v. Harriman,* 88 U. S. (21 Wall.) 44, 63, 22 L. Ed. 551. It held:

"And it is settled law that no one can take advantage of the non-performance of a condition subsequent annexed to an estate in fee, but the grantor or his heirs, or the successors of the grantor if the grant proceed from an artificial

person; and if they do not see fit to assert their right to enforce a forfeiture on that ground, the title remains unimpaired in the grantee. The authorities on this point, with hardly an exception, are all one way from the Year Books down. And the same doctrine obtains where the grant upon condition proceeds from the government; no individual can assail the title it has conveyed on the ground that the grantee has failed to perform the conditions annexed."

However, the state is a party to these proceedings. Its amended answer and cross-complaint alleges and prays as follows:

"III. That the defendant City of Seattle has not at any time since September 11, 1939, used the above described shore lands for a municipal park or playground purposes, and no use of said shore lands for such purposes was commenced within one year from the date of said deed; that the title and interest of defendant City of Seattle in and to said shore lands has reverted to the defendant State of Washington.

"WHEREFORE these answering defendants pray as follows:

"1. That it be adjudged and decreed that the title and interest of the defendant City of Seattle in and to said shore lands has reverted to defendant State of Washington and that title to said shore lands be quieted in said defendant State of Washington, free and clear of any right, title, interest or claim whatsoever of said defendant City of Seattle."

We have heretofore pointed out that the provision that the reversionary clause should be invoked, if the use for park or playground purposes be not commenced within one year, is in derogation of the legislative grant, was inserted in the deed without authority, and is void. But, assuming that the attorney general and the land commissioner had otherwise proper authority to bring a suit for forfeiture, we are of the opinion that no case is made out on the ground that the city has not continued "to hold, use and maintain said lands for" park or playground purposes, which is the only legal ground upon which the state could rely.

The evidence shows that the city accepted the conveyance and transferred the management of the property to its board of park commissioners. The park board immediately gave notice to occupants of houseboats, moored on the lots or por-

tions of lots covered by water, to remove them and vacate the premises. It also caused brush, stumps and rubbish upon the property to be removed, and a considerable quantity of earth to be deposited upon the tract referred to in the testimony as the lower or south tract. Residents of the district caused trees to be trimmed and the view of the lake from their properties to be improved. The evidence also shows that a boy scout troop has regularly used part of the property for many years as a place for wading and fly-casting, and that, since the issuance of the deed, a water ski club has used the lower tract in indulging in a sport known as water skiing. The evidence shows that, since the institution of the cross-complaint, the park board has expended approximately two hundred dollars, contributed by residents of the district, in causing piling and other unsightly objects to be removed.

The testimony of Mr. Gibbs, president of the park board, if reduced to narrative form, would read substantially as follows:

The board of park commissioners requested the council to make application for the property. It was the thought of the commission that a fill could be made on the south section equipped with children's playgrounds, wading pool, sand boxes, and things of that kind, and the rest landscaped; that was the primary intention of the board. In the north section, it was rather difficult to do a great deal, with the exception of planting a few trees and possibly some lawn, but the south section is very important for a playfield for the Madison street district. The north portion was just to be left open space. It is a beauty spot overlooking the northeast section. On October 26, 1939, we were notified we had the deed. The same day we ordered a survey, and at a subsequent meeting, November 9th, after a cost survey, the survey was ordered on a basis of thirty dollars a day. On November 30th, notice to vacate was given to various houseboat occupants that had houseboats on the property. On January 4, 1940, the park superintendent was ordered to have twelve hundred yards of earth hauled in, and that was done between January 18, 1940, and March 29, 1940. The

trees and shrubs were ordered cut down adjacent to the street, which was done about the same time. We have ordered the grader out there two or three times, and recently the piling that has been in there for many years was ordered cleaned out, and the pile driver just recently cleaned most of it out.

As president of the park board, I regard all of this property as suitable and needed for park purposes. That one block in particular is very important to the park system for the district. We have just a bathing beach at the end of Madison street.

The north lots would not be suitable for playfield purposes. The area of land there is very small, mostly water, but a small part is land. I am not certain that the general public has no access to that strip over a private road. I know there has been some discussion about it, and some controversy over it, but I understand at the present time that it has not been settled. The amount that was spent would run into several hundred dollars. The nature of the private road or the possibility of obtaining access to the property was checked into by the park engineer. I remember one of our park board commissioners was down there (at Olympia) to endeavor to get this particular tract, but that was subsequent to the act. To the best of my knowledge, I have always considered it a very valuable piece of property for park purposes.

The park commissioners have talked that over many times. Motions were adopted to have it filled. The first motion was on the fill of twelve hundred yards of dirt. There were several trees cut down, cottonwoods, poplars, and different types of small trees that lined the shores, that were cut down and taken away. When that fill is made, the entire landscaping will take place. This will be done by degrees, as our budget allows us to do these things. In fact, we are working on a small budget for general maintenance, and we have to do these things when we can, not when we would like to.. We would have had that improved some time ago if we had had the funds to do it with. The fill was put in, I believe, in the spring of 1940.

The dirt came from Madison street. I believe the contractor dumped some of it. I believe we used some of our own trucks to haul in the material. The park board spent some money for surveys, and we also spent quite a little money on maintenance in cleaning off the brush and trees, which all came out of maintenance. We spent some money recently for cleaning the place up. The contract had been let for cleaning it up. The money is not spent yet. It is being held. There have been times when the crew was sent out there to clean things out when we could spare them from other work. The contract has been let for the work, but the contractor has not finished the job because of this suit in intervention. Most of the work has been done, the cleaning out of stumps and the piling, and so forth. It was just the dolphin that was left, and that cleans the contract.

That is true, it is a common occurrence in the operation of parks to have contributions from residents for the work. We endeavor to encourage district contributions. In fact, in nearly every case we try to get the various districts to co-operate fifty-fifty. There were several delegations that went out to investigate the feasibility or usefulness for park purposes. I believe there was a council delegation besides the park delegation.

■ Undoubtedly, the institution of this suit, which was commenced less than five months after the issuance of the deed, and in which plaintiffs prayed for the issuance of an injunction restraining the city from establishing or attempting to establish a park or playground upon any of the property and from expending any funds for that purpose, deterred the city from expending more money than it did in improving the grounds. But there is no requirement in the statute that the city shall expend any funds. We think that the evidence shows that the park board has complied with the requirements of the statute, and has held, used and maintained the property for park and/or playground purposes, and intends to continue to do so.

It is further contended as against the city that the property is not suitable or needed for park "and/or play-

ground purposes." This contention is based mainly upon the fact that lots 1, 3, 4, and 5, block 24, are not contiguous to the rest of the property included in the conveyance; that lots 1, 3, and 4 are entirely covered by water, and all of lot 5, except a very small part thereof, is covered by water; that access to lots 1, 3, 4, and 5, block 24, cannot be had by land, except over land which is in private ownership. It appears that 43rd avenue north, which extends in a northerly and southerly direction, approximately parallel with the shores of the lake, extends north no farther than McGilvra street. Here, a piece of uplands, not a part of the state's plat of the shorelands (the plat embraces lands that were formerly under water, but which were uncovered when the lake level was lowered some years ago, as well as the area between the present shorelands and the inner harbor line, which is some distance out in the water), intervenes between the north end of 43rd avenue north and the south end of Lakeside avenue north, which is approximately 130 or .150 feet farther north. Lots 1, 3, 4, and 5, block 24, abut upon the east side of Lakeside avenue north. The property on the east side of this strip is owned by the Wickstroms and Batchelors, and they have an easement of way over the east half thereof, granted them by a former owner of the fee. The citizens' committee found, and the president of the park board testified, that all of the property was suitable and needed for park and/or playground purposes.

This court will take judicial notice of the fact that Lake Washington is a large body of water within a few minutes' ride of downtown Seattle. Ever since Seattle was a village, multitudes of people, old and young, have resorted to its shores for recreation and enjoyment, have camped upon its beaches, and glided over its surface in canoes and sailboats. Probably, the Indians so used it before the coming of the white man. Lots 1, 3, 4, and 5, block 24, are upon a sort of peninsula that projects out into the lake where the main waters of the lake meet the waters of what is known as Union Bay. Here, an expansive view of the lake is obtained

in three directions, with the Cascades as a backdrop in the distance.

■ A park is a pleasure ground set aside for recreation of the public to promote its health and enjoyment. *Williams v. Gallatin,* 229 N. Y. 248, 128 N. E. 121, 18 A. L. R. 1238; *Booth v. Minneapolis,* 163 Minn. 223, 203 N. W. 625; *State ex rel. Hammann v. Levitan,* 200 Wis. 271, 228 N. W. 140; 39 Am. Jur. 803, § 2. It is said in *Phillips v. Laguna Beach Co.,* 190 Cal. 180, 211 Pac. 225:

"A park does not have to be laid off in paths or planted with flowers. It may be merely an open space which the public may use for any purpose it sees fit of a public nature. Such use was made of that land, and as constantly as could be expected under the circumstances."

■ It was alleged and contended that the city did not obtain lots 1, 3, 4, and 5, block 24, for park or playground purposes, but to benefit the Madison Park Corporation. The Madison Park Corporation owns a large tract of land bounded on the north by the waters of Lake Washington and Lakeside avenue north, on the east by Lakeside avenue north and the property owned by the Batchelors and Wickstroms, and on the south by McGilvra street. The property is improved by numerous apartment houses known as Edgewater Apartments. Undoubtedly, the removal of the houseboats and other unsightly objects from the water in front of these apartments has been of benefit to this company; but we cannot hold, from the evidence in the case, that the purpose of the city in acquiring these lots was not to benefit the public generally.

Appellants Wickstrom and respondents Fisher contend that chapter 157, Laws of 1939, under which the conveyance was issued to the city, is unconstitutional. It would seem doubtful whether they have any interest which would entitle them to question the validity of the act of the legislature. See *Ajax v. Gregory,* 177 Wash. 465, 32 P. (2d) 560; *In re Hendrickson,* 12 Wn. (2d) 600, 123 P. (2d) 322; 1 Cooley's Constitutional Limitations (8th ed.) 339; 11 Am. Jur. 748, § 111. But, in any event, their contentions amount to but little more than this: that the state cannot, under

the constitution, grant to a municipal corporation state-owned lands without consideration.

■ But the state is not parting with the title to its lands. In the printed portion of the deed, reading "convey . . . and assigns, the following described shore lands," and so forth, the state inserted between the words "the" and "following" the words "the use of," so that the deed conveys the use of the lands only, not the title in fee. It merely grants the use thereof to the municipal corporation for certain public purposes. The use of land for park or playground purposes is a public use. *Rudacille v. State Commission,* 155 Va. 808, 156 S. E. 829.

A conveyance of public lands to a municipal corporation—which for many purposes is but an arm or branch of the state government—for park and/or playground purposes, is not a conveyance without consideration to the state and violates no provision of the constitution. *Saucier v. New Orleans,* 119 La. 179, 43 So. 999. See, also, *Lancey v. King County,* 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817; *Bilger v. State,* 63 Wash. 457, 116 Pac. 19; *State ex rel. Board of Commissioners v. Clausen,* 95 Wash. 214, 163 Pac. 744; *Georgia v. Cincinnati So. R.,* 248 U. S. 26, 63 L. Ed. 104, 39 S. Ct. 14.

■ Appellants Wickstrom also contend that the title of the act is insufficient under Art. II, § 19, of the state constitution, providing that no bill shall embrace more than one subject, and that shall be expressed in the title. We think there is no merit in this contention. The act embraces but one subject, and that is expressed in the title. *Lancey v. King County, supra; Northern Cedar Co. v. French,* 131 Wash. 394, 230 Pac. 837; *State ex rel. Port of Seattle v. Department of Public Service,* 1 Wn. (2d) 102, 95 P. (2d) 1007.

■ It is contended that the use of the expression "and/or" in the title of chapter 157, Laws of 1939, in § 1 of that act, and in the deed of the state to the city, renders the act itself and the deed issued in pursuance thereof wholly void for uncertainty. The use of that method of expression has been criticized in many legal opinions. How-

ever, Webster's New International Dictionary (2d ed.), published in 1945, defines the terms as follows: "and/or. Either *and* or *or*. 'Butter *and/or* eggs' means 'butter and eggs, or butter or eggs.' "

· See, also, Funk and Wagnall's New Standard Dictionary of the English language (1942); 45 Yale L. J. 918; 118 A. L. R. 1363 and 154 A. L. R. 866.

In our opinion, there is no uncertainty as to the meaning of the act or the grant in the deed. It seems perfectly clear that the lots were deeded for municipal park and playground purposes, or for either of those purposes, and that the state cannot forfeit the grant so long as the city continues "to hold, use and maintain said lands" for either a playground or a park.

Contention is made by the Wickstroms that the city, in accepting a deed from the Madison Park Corporation to a strip of land for the widening of McGilvra street and in constructing the street over an area of ground approximately 38 by 40 feet and which now constitutes the northeast quarter of the intersection of 43rd avenue north and McGilvra street, and over which area they had an easement of way granted them by a former owner of the fee, took property of theirs without compensating them therefor. The decisions hold, and we think correctly, that the construction of a street over land in which another has an easement of way which is not exclusive, does not constitute an interference with such easement, and that the owner thereof is not entitled to damages, although he paid a consideration for it. *Clayton v. Gilmer County Court*, 58 W. Va. 253, 52 S. E. 103, 2 L. R. A. (N. S.) 598; *In re City of New York*, 196 N. Y. 286, 89 N. E. 829, 37 L. R. A. (N. S.) 281; *In re Appeal of Sowers*, 175 Minn. 168, 220 N. W. 419. See, also, 1 Nichols on Eminent Domain (2d ed.) 349, § 121.

Some contention is made by the Wickstroms that the court should have enjoined the Madison Park Corporation from maintaining a fence, at some location which we cannot determine from the evidence, which obstructs their access to Lakeside avenue north. The trial court did not pass upon that issue; nor shall we. We think it is an issue

which should not have been interjected into this suit. If appellants are entitled to have the fence removed, they will be at liberty to enforce it in some other proceeding.

Appellants Wickstrom also claim that the government meander line, as delineated on the state's plat of the shorelands, does not conform to the field notes of the original survey made in 1855, and that the state included in its plat certain uplands which it had no right to include. Appellants do not claim that they are the owners of any uplands erroneously included in the plat, and we are unable to perceive how the fact, if it is a fact, that the plat includes uplands which the state had no right to include in the plat, has anything to do with the issues involved in this case. The only testimony with regard to the matter was that of Wickstrom himself, who testified that he was an engineer and had checked the meander line shown on the plat with the original government field notes. This testimony was wholly insufficient to impeach the plat. *Rue v. Oregon & Washington R. Co.,* 109 Wash. 436, 186 Pac. 1074.

The decree appealed from, in so far as it holds that the use of the lands granted to the city of Seattle by the instrument recorded in vol. 1862 of Deeds, p. 347, of the records of the auditor of King county, Washington, has reverted to the state, is reversed on the cross-appeal of the city of Seattle, and in all other respects affirmed.

It is so ordered.

BEALS, C. J., BLAKE, and JEFFERS, JJ., concur.