**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 29, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 29, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| FLOYD F. RINEHOLD and CLARISSA E. RINEHOLD, husband and wife, | NO. 98694-1 |
| Petitioners, | EN BANC |
| v. | Filed: <u>July 29, 2021</u> |
| GARY T. RENNE and ELEANOR F. RENNE, husband and wife, | |
| Respondents, | |
| DONALD DUANE DeNOTTA and CARON DeNOTTA, husband and wife, and D.D. DeNOTTA, LLC | |
| Defendants, | |
| SCHOOL EMPLOYEES CREDIT UNION OF WASHINGTON, a Washington Credit Union; PINNACLE CAPITAL MORTGAGE CORP. D/B/A CASCADE MORTGAGE, a Washington Corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation, as Nominee for Pinnacle Capital Mortgage Corp. D/B/A Cascade Mortgage; CAVALRY SPV I LIMITED LIABILITY COMPANY, a Washington limited liability company, as Assignee of HSBC Bank Nevada, | |
| Third Party Defendants. | |

No. 98694-1

GORDON MCCLOUD, J.—The Rinehold and Renne families[1] dispute the location of the shared boundary line between their respective Mason County properties. They agree that the property was subdivided in the 1950s by surveyor W.O. Watson and that the boundary line is where Watson located it. But they disagree about where Watson located that boundary.

The Rineholds commissioned a professional retracement survey of the property line in 2015. They contend that the survey definitively establishes the boundary location, absent a countervailing survey or adverse possession. Thus, they claim, they are entitled to partial summary judgment as to the "record title" location of the boundary. The Rennes contend that inconsistencies in the 2015 retracement survey and ambiguity in Watson's use of the terms "street" and "road-way" create a dispute of material fact that must go to a jury.

We agree with the Rennes and affirm the Court of Appeals.

FACTS

I.      A MASON COUNTY SURVEYOR CREATED THE BOUNDARY IN 1952

Surveyor W.O. Watson subdivided the Mason County Sunset Beach area in 1952. Clerk's Papers (CP) at 29-32, 206, 208. Watson's contemporary plat maps show that the parcel now owned by the Rennes sits slightly back from State Route

_____

[1] Petitioners Floyd F. Rinehold and his wife, Clarissa E. Rinehold (Rineholds), and respondents Gary T. Renne and his wife, Eleanor F. Renne (Rennes).

2

(SR) 106, narrowing from 102 feet across on its northern side to 55 feet across on its southern side. CP at 29, 206. That parcel is bordered along its eastern and southern sides by a narrow strip that Watson labeled "street." CP at 32, 208. Watson's maps indicate that the "street" is 42 feet across at the northern edge of the Renne parcel. CP at 29, 206.

In 1955, Watson conveyed what is now the Renne property to Albert Harold Johnson by warranty deed (1955 Watson-Johnson deed). CP at 144-45. That deed described the property. CP at 144. From the northwestern corner of the parcel, the property extended "102 feet to [the] Northeast corner of the tract hereindescribed and West side of road-way." *Id.* From there, the property continues "South 10°00' East along Westerly margin of said road-way" for 415 feet before turning "still along Northwesterly margin of said road-way 55 feet" to the southwest corner. *Id.*

Watson conveyed other subdivided parcels at Sunset Beach to various other individuals. But he did not convey the parcel labeled "street" and described as a "road-way," instead "conced[ing it] to belong to those tracts numbered one, two, three, four, five for ingress and egress of owners of same." CP at 29, 32, 144. It now belongs to the Rineholds, subject to Watson's easement.

3

No. 98694-1

II.   SUBSEQUENT OWNERS HAVE COMMISSIONED THREE SURVEYS OF THE
      BOUNDARY LINE SINCE 1955

In 1979, surveyor Roger Lovitt created a plat map of a portion of the Sunset

Beach area.  CP at 34.  Lovitt marked the north side of the Rennes' (then

Johnson's) property as exactly 102 feet, consistent with Watson's plat map and

description.  *Compare* CP at 34 (Line N), *with* CP at 29, 144, 206.

By 1994, Joan Addington had obtained the parcels originally retained by

Watson, including the "street" or "road-way" that is now the Rinehold property.

CP at 36-43.  She commissioned a survey from Daniel Holman, who provided a

metes and bounds description of each parcel.  *Id.*  Holman's findings were

inconsistent with the previous Watson and Lovitt surveys in at least two specific

ways.

First, Holman followed a different angle along the now-disputed boundary

than that described by the Johnson deed and followed by Lovitt.  *Compare* CP at

36 (S 09°51'16" E), *with* CP at 34 (S 10°00'00" E), 144 ("South 10°00' East along

Westerly margin of said road-way").  Second, Holman noted that the "road-way"

or "street"  (then a part of Addington's "Lot 3") extended 52.14 feet along SR 106,

contradicting Watson's original labeling of 42 feet.  *Compare* CP at 36 (marked as

4

No. 98694-1

L2 and L3 added together), *with* CP at 29, 206.[2]  No explanation of either of these discrepancies appears in the record.

In 2004 and 2005, the Rineholds purchased two lots from Addington, including the "road-way."  CP at 51-54.  The deed referenced the lot numbers from Holman's 1994 plat map as the property conveyed.  CP at 53.

The Rennes purchased their property in 2006.  CP at 48-49.  The metes and bounds property description on the deed to the Rennes mirrored the description from the 1952 Watson-Johnson deed, including the reference to the "road-way."  CP at 49.

In 2015, the Rineholds hired Holman to conduct a new survey of their property.  CP at 22.  Holman calculated the relevant boundaries and distances consistent with his own prior 1994 survey and inconsistent with the Watson and Lovitt maps in the same two ways mentioned above.  *Compare* CP at 27, *with* CP at 36.  Based on where he located the boundary, he noted encroachment by the Rennes and by the Rineholds' neighbors to the east into what he designated the Rineholds' property.  CP at 27.  Holman also marked a "gravel road" running through the center of the Rineholds' property.  *Id.*

---

[2] Watson's 42-foot notation measured from the corner of the Renne property and Holman measured along SR 106, about 22.42 feet farther north.  CP at 36, 206.  But the angles of the street's borders should have caused the measurement to be narrower along SR 106 than where Watson measured.

No. 98694-1

III.    THE RINEHOLDS SUED THE RENNES TO QUIET TITLE

In May 2017, the Rineholds filed a quiet title action against the Rennes, alleging that they "wrongfully used or constructed improvements upon" and took "other actions upon or proximate to" their property, thereby "creat[ing] a cloud on" their title.  CP at 3.

In May 2018, the Rineholds moved for partial summary judgment, arguing that Holman's 2015 survey was "a true, correct, and accurate survey and representation of the record title" to both their property and the easterly boundary line of the Rennes' property.  CP at 8-9.  They sought to definitively establish the "line of record title as determined by a proper survey" between the properties, leaving other issues, such as adverse possession, for trial.  CP at 18.

The Rennes opposed summary judgment, arguing that the term "road-way" in their deed was ambiguous:  it could mean "the physical roadway itself" (the narrow strip Holman labeled "gravel road") or "the abstract concept of a roadway" (the entire portion of the Rinehold property that Watson labeled a "street").  CP at 66.[3]  The Rineholds argued that only a surveyor's opinion could "counter" their

---

[3] The Rennes also argued that summary judgment was inappropriate because they and their predecessors in interest had adversely possessed the contested strip.  CP at 66.  The trial court correctly ruled that the Rineholds' partial summary judgment motion would not have foreclosed the Rennes from raising adverse possession at trial.

6

No. 98694-1

motion and that the Rennes had not provided such an opinion. 2 Verbatim Report of Proceedings (VRP) (July 2, 2018) at 37. Notwithstanding Watson's "road-way" and "street" language, the Rineholds claimed there was "no proof that there was even a road in existence" in the 1952-1955 time frame at issue. *Id.*[4]

In support of their motion, the Rineholds submitted a declaration from Holman. Holman did not believe the "references to the roadway in the Renne chain of title" could possibly describe the "present, physical roadway" (his "gravel road") because "the description would not close by twelve feet more or less" and "[b]eing familiar with Watson's work, he would not have made that significant a mistake." CP at 23-24.[5]

---

[4] Both parties also disputed the relevance of various iron pipes arguably placed by Watson at the corners of the Renne parcel and located by Holman and the Rennes. Because we hold that summary judgment was inappropriate regardless of the significance of any pipes, we do not address the pipe-related arguments in this opinion. The parties are of course free to debate the relevance of the pipes at trial.

[5] At a deposition of Holman, the following exchange about the meaning of "roadway" occurred between Holman and the Rennes' attorney:

> Q. All right. Do you know what I mean by the word "roadway"?
> A. Well, there's two possibilities I suppose.
> Q. Okay. Well, when you see a roadway, is there any dispute to you, like—
> A. Well, there is—
> Q. —when you look at a roadway, you know what it is?
> A. —the physical road.
> Q. All right.
> A. And there are the edges of the platted road, mapped road, described road margins, right-of-ways, things like that.
> Q. Okay.

No. 98694-1

The trial court questioned the inconsistency between Holman's and Watson's measurements as to the width of the "road-way." 2 VRP (July 2, 2018) at 49 ("[C]an you account for how Holman's at 52' and Mr. Watson was at 42'?"). The Rineholds' attorney responded, "I can't answer that" and stressed that the issue had not been raised. *Id.* at 49-50. The attorney said that "it may affect the east line of the [Rinehold][6] property. But the only evidence before this Court right now is that the west line is all consistent." *Id.* at 50.

Despite the inconsistencies, the trial court granted the Rineholds' partial summary judgment motion. CP at 193-94. It stated that the deed language was "at least potentially ambiguous" and looked to extrinsic evidence to determine "whether there [was] an issue of material fact regarding the location of the westerly

---

A. So there's the physical road and there's areas set aside for the road. Two different things.
Q. All right. When you hear the term "roadway," what do you envision? The physical road or all the other things that are on the outside of the roadway?
A. Depends on the context.
Q. Okay. How about this context: There's a road that we just talked about that goes from SR 106 up and to the properties, correct?
A. There's an area set aside for a roadway and there's a physical roadway.

CP at 188-89. Obviously, Holman himself thought "road-way" could have two different meanings.

[6] The Rineholds' attorney actually said "the east line of the Renne property." 2 VRP (July 2, 2018) at 50. But he later clarified that he had meant the east line of the Rinehold property. *Id.* at 51. The east line of the Renne property is the disputed boundary in this case and conceding an error in that measurement would have effectively conceded the Rineholds' case for summary judgment.

8

No. 98694-1

boundary of the roadway." 1 VRP (July 16, 2018) at 5. Despite Watson's

references to a "road-way" and a "street," the court found "no evidence" as to

"whether the roadway existed at the time the [Watson] deed was drafted." *Id.*

Regarding the inconsistencies between Holman's and Watson's surveys, the

trial court deferred to Holman: "Mr. Holman has taken this as well as any other

irregularities similar to these . . . into consideration and provided his expert opinion

based upon all the considerations as further described in his declaration." *Id.* at 7.

It went on:

> In short, when it comes to surveys the Court does not look to perfection,
> that all evidence matches up perfectly. Instead, the Court relies upon
> the evidence presented to determine whether any of the imperfections
> rise to the level of a genuine issue of material fact.
>
> In this review, the Court is able to rely upon experts, such as Mr.
> Holman, to provide an opinion on whether the boundary line can be
> established, how it can be established and where it is located. With no
> expert counter-opinion related to the survey line the Court finds that
> there is no issue of material fact as to the surveyed boundary line
> prepared by Mr. Holman provided by the plaintiff in the form of a
> declaration establishing the common boundary line between the
> plaintiff and Defendant Rennes' properties.

*Id.* at 7-8.

The Rennes moved for reconsideration and submitted additional evidence

about the existence and location of the roadway in 1951 and 1968. CP at 201-12,

217, 289-98, 305-08. This evidence included numerous aerial maps of the area as

No. 98694-1

far back as 1951 and declarations from a Geographic Information Systems (GIS) specialist and a surveyor. CP at 289, 305. The GIS specialist stated, based on an aerial map from 1951, "It is clear to me that there is a road here" and that "[i]t is obvious to a trained . . . (geographic information specialist) that this cleared linear area is for a road as can be seen." CP at 293. He also stated that the "width of the traveled portion of the roadway" was approximately 20 feet both in 1951 and in 2018. CP at 297. The surveyor critiqued Holman's survey for its inconsistencies and noted that it did "not even mathematically close." CP at 306-07.

Relying on the "priority of calls," the trial court denied reconsideration.[7] CP at 409; 1 VRP (Oct. 17, 2018) at 16-17. It explained that Holman's survey was evidence of "lines actually run in the field," the highest priority call, while the Rennes' had submitted only inferior calls, such as the artificial monument of the roadway. 1 VRP (Oct. 17, 2018) at 16-17. The court held:

> While the Court recognizes that there may be a genuine issue of material fact regarding whether a roadway existed at the time of the deed, no effort has been made by Defendant Renne to relate this purported roadway to the actual lines run in the field. Critiques of the actions of other surveyors are not surveys themselves. While the Court understands the criticisms of the retracement surveys, the Court has not

---

[7] Our Court of Appeals has used a "priority of calls" to resolve conflicting information as to the location of a boundary line: "In cases of conflicting calls, the priority of calls is: (1) lines actually run in the field, (2) natural monuments, (3) artificial monuments, (4) courses, (5) distances, (6) quantity or area." *DD&L, Inc. v. Burgess*, 51 Wn. App. 329, 335-36, 753 P.2d 561 (1988) (citing 6 GEORGE W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY, § 3044, at 571 (1962 repl.)).

10

received a contrary retracement survey. In short, Defendant Renne has not provided the Court with any evidence related to the lines run in the field and how such lines further relate to the evidence provided by the plaintiffs.

Issues related to the purported conflicting calls in the deed which focus on the location of the roadway and a measurement called out in the deed will not be further considered in this motion because the Court has evidence which established the priority call, namely the lines run in the field. The Court would only analyze these two lesser-priority calls if there was no evidence addressing the priority call of the lines run in the field.

*Id.* at 17-18. The trial court certified its decisions for appellate review. CP at 409-11.

The Court of Appeals reversed. It held that the trial court had erred by holding that Holman's survey "reflected the lines that Watson actually ran in the field when preparing his survey and plats" and that "the Rennes were required to produce their own survey in order to challenge the validity of Holman's survey." *Rinehold v. Renne*, No. 52915-7-II, slip op. at 17 (Wash. Ct. App. Mar. 10, 2020) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2052915-7-II%20Unpublished%20Opinion.pdf. It concluded that issues of material fact precluded summary judgment, primarily concerning Watson's intended meaning of "roadway" and the inconsistency between the 102-foot distance call and the artificial monument "roadway" call. *Id.* at 18-19.

No. 98694-1

We granted the Rineholds' petition for review to decide whether the Rennes were required to commission their own retracement survey to rebut Holman's survey and whether a genuine dispute of material fact exists as to Watson's intended boundary line. We affirm the Court of Appeals, which held that the answer to the first question is no and the answer to the second question is yes.

ANALYSIS

I. THE GOAL IN A PROPERTY LINE DISPUTE IS TO DETERMINE WHERE THE GRANTOR LOCATED THE BOUNDARY

"[T]he location of a boundary line by a common grantor is binding upon the grantees and their successors in interest, who take with reference thereto." *Clausing v. Kassner*, 60 Wn.2d 12, 15, 371 P.2d 633 (1962) (citing *Martin v. Hobbs*, 44 Wn.2d 787, 790, 270 P.2d 1067 (1954); *Angell v. Hadley*, 33 Wn.2d 837, 207 P.2d 191 (1949); *Atwell v. Olson*, 30 Wn.2d 179, 190 P.2d 783 (1948); *Strom v. Arcorace*, 27 Wn.2d 478, 178 P.2d 959 (1947); *Windsor v. Bourcier*, 21 Wn.2d 313, 150 P.2d 717 (1944); *Roe v. Walsh*, 76 Wash. 148, 135 P. 1031, 136 P. 1146 (1913); *Turner v. Creech*, 58 Wash. 439, 108 P. 1084 (1910)). Watson, the common grantor, created the boundary line at issue here by subdividing the Sunset Beach area in 1952 and conveying what is now the Renne property to Johnson in 1955. Thus, the boundary is wherever Watson "locat[ed]" it. CP at 144-45. As evidence of Watson's intent, the record contains a metes and bounds property

12

description in the 1955 Watson-Johnson deed, plats Watson created of the area in 1952, and three retracement surveys in the years since.

Where "questions arise concerning the true boundaries" among a plat's "component parcels, the question to be answered is not where new and modern survey methods will place the boundaries, but where did the original plat locate them." *Staaf v. Bilder*, 68 Wn.2d 800, 803, 415 P.2d 650 (1966). "The main purpose of a resurvey is to rediscover the boundaries according to the plat upon the best evidence obtainable and to retrace the boundary lines laid down in the plat. Effort should be made to locate the original corners. Despite discrepancies in the original plat, the known monuments and boundaries of the original plat take precedence over other evidence and are of greater weight than other evidence of the boundaries not based on the original monuments and boundaries." *Id.* (citation omitted).

In interpreting a deed, "it is the real intention of the parties, to be gathered from the writing, if possible, but, when necessary, by resort to the circumstances surrounding the entire transaction, that must control." *Hirt v. Entus*, 37 Wn.2d 418, 428, 224 P.2d 620 (1950) (citing *Wis. Realty Co. v. Lull*, 177 Wis. 53, 187 N.W. 978 (1922)). "'[I]t is a factual question to determine the intent of the parties' with the court then 'apply[ing] the rules of law to determine the legal consequences

No. 98694-1

of that intent.'" *Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365, 374-75, 113 P.3d 463 (2005) (second alteration in original) (quoting *Veach v. Culp*, 92 Wn.2d 570, 573, 599 P.2d 526 (1979)).

"[I]f the description of the land [in a deed] be fixed by ascertainable monuments and by courses and distances, the well settled general rule is that the monuments will control the courses and distances if they be inconsistent with the monument calls." *Matthews v. Parker*, 163 Wash. 10, 14, 299 P. 354 (1931); *see also Campbell v. City of Seattle*, 59 Wash. 612, 614, 110 P. 546 (1910) ("[I]t seems to be a well established rule that courses and distances must be subordinated to original stakes and surveys showing the location and dimensions of lots.").

II.    THE RENNES WERE NOT REQUIRED TO PROVIDE THEIR OWN RETRACEMENT SURVEY TO DEFEAT SUMMARY JUDGMENT ON THE ISSUE OF THE BOUNDARY LOCATION

"'In general, expert testimony is required when an essential element in the case is best established by an opinion which is beyond the expertise of a layperson.'" *Berger v. Sonneland*, 144 Wn.2d 91, 110, 26 P.3d 257 (2001) (quoting *Harris v. Groth*, 99 Wn.2d 438, 449, 663 P.2d 113 (1983)).  The Rineholds contend that boundary line disputes require expert testimony from a professional surveyor such that the Rennes may not rebut Holman's retracement survey without commissioning a survey of their own.

14

No. 98694-1

But we have never required every party to a boundary line dispute to commission an expert survey, as the Rineholds themselves acknowledge. Rineholds' Suppl. Br. at 7. The Rineholds have not cited any decision from any jurisdiction where a court has held that a retracement survey is irrefutable unless contradicted by a countervailing retracement survey.

The Rineholds principally rely on *Rue v. Oregon & Washington Railroad Co.*, 109 Wash. 436, 186 P. 1074 (1920), to show that "competent testimony of a surveyor is necessary to rebut the conclusion of another surveyor." Rineholds' Suppl. Br. at 7. But *Rue* does not support their position.[8] In that case, a civil engineer "examined the territory in question and found that the course of [a] stream was not as shown on the government plat, but as he describe[d] it on a plat which he produced." *Rue*, 109 Wash. at 440. The trial court rejected the engineer's plat because he "made no instrumental survey of the territory or the stream, but merely a visual survey without any actual measurements and without determining the

---

[8] Notably, *Rue*, and many of the other decisions relied on by the Rineholds are appeals from rulings made *after* trial, rather than on summary judgment. *See, e.g.*, *Rue*, 109 Wash. at 437 ("At the *trial* appellant claimed and attempted to prove that there was error in the survey and plat . . . ." (emphasis added)); *Staaf*, 68 Wn.2d at 802-03 (deferring to trial court's findings after hearing detailed facts and conclusions "derived therefrom by professional surveyors" regarding disputed facts); *Neeley v. Maurer*, 31 Wn.2d 153, 154, 195 P.2d 628 (1948) ("The case, tried to the court . . . ."); *Thompson v. Schlittenhart*, 47 Wn. App. 209, 213, 734 P.2d 48 (1987) (appeal from decision after trial); *DD&L, Inc.*, 51 Wn. App. at 336 (same).

15

No. 98694-1

exact course, sinuosities, and location of the stream.  He had never even made any land surveys, although he was probably professionally competent to do so."  *Id.*  As a result, "[w]hat [the engineer] did in this matter . . . was merely nonexpert," and the court could not "consider that his evidence was competent to prove the facts which it was offered to prove or sufficient to contradict or impeach the official government survey."  *Id.*  The reason was not simply that he was a nonexpert, but that his testimony contradicted "indisputable fact[s]" about the property at issue and was "nothing but the merest conjecture or guesswork."  *Id.* at 442.  Because of those additional flaws, the engineer's testimony "was not such evidence as would be heard in any court to impeach the official survey."  *Id.*[9]

The *Rue* court did not hold that nonexpert testimony can never "contradict or impeach" a survey in the context of a summary judgment motion; it held only that

---

[9] The Rineholds also rely on *Batchelor v. Madison Park Corp.*, 25 Wn.2d 907, 172 P.2d 268 (1946), and *Murray v. Bousquet*, 154 Wash. 42, 280 P. 935 (1929).  In *Batchelor*, an engineer, who was a party to the case, testified that a government plat was inconsistent with field notes from an 1855 survey.  25 Wn.2d at 926.  His testimony was "wholly insufficient to impeach the plat" because the field notes were not in the record and the testimony, if true, "ha[d not]hing to do with the issues involved in th[e] case."  *Id.*  *Murray* held that "[t]he result of a survey made by a qualified surveyor who runs his lines from established government corners . . . is competent evidence to show an error in a government map" and that "corners of the government subdivisions are where the government surveyors placed them, and corners thus established are conclusive as to location of boundary lines of sections.  If original corners can be found, they govern, though inconsistent with the description in the map."  154 Wash. at 46.  Neither of these cases held that a retracement survey may be challenged only by a countervailing retracement survey.

16

the imprecise, nonexpert survey testimony at trial in that case could not replace or impeach the "official government survey." *Id.* at 440. Most importantly, the engineer in *Rue* did not challenge a *retracement* survey, but the *original* survey that created the boundary line at issue. *Id.* at 438-39. And he did so basically by eyeballing the property and presenting that testimony at trial—not by pointing out ambiguities in the original deed and contradictions between that deed and later surveys. If the Rennes claimed that Watson's 1952 plat map or the 1955 Watson-Johnson deed were erroneous based on their own individual view of where the boundary should be, their argument would be more similar to that made in *Rue*. But they do not. Instead, they use that very 1952 plat map and 1955 deed to point out potential flaws in Holman's 2015 retracement.

Contrary to the trial court's ruling, the Rennes were not required to commission their own survey to challenge the Rineholds' partial summary judgment motion.

III.  WATSON'S INTENT IN THE 1955 WATSON-JOHNSON DEED PRESENTS A DISPUTED QUESTION OF MATERIAL FACT

The boundary line is wherever Watson placed it. To determine where Watson intended to place it, we look to the 1955 Watson-Johnson deed, Watson's 1952 plat map, and the retracement surveys performed by Lovitt and Holman. After considering all this evidence, a disputed question of material fact remains as

17

to the location of the eastern boundary of the Renne property because it is unclear what Watson meant by "road-way" and whether his intended meaning of "road-way" was consistent with his 1952 plat maps.

The superior court found that Holman's retracement survey provided "lines actually run in the field" which controlled the boundary over any conflicting evidence. 1 VRP (Oct. 17, 2018) at 16-18. But Holman's survey did not create lines in the field. By performing a retracement survey, Holman sought to *find* those lines originally run by Watson. *See, e.g.*, 10 THOMPSON ON REAL PROPERTY, THIRD THOMAS EDITION § 90.04(f) at 732-33 (3d Thomas ed. 2013) ("The lines marked on the ground constitute the actual survey, and where those lines are located is a matter to be determined by the jury from all the evidence."); WALTER G. ROBILLARD & LANE J. BOUMAN, CLARK ON SURVEYING AND BOUNDARIES § 14.01, at 369 (7th ed. 1997) ("When a subsequent survey is made, it may be difficult to tie that survey to the original, yet the original survey will control."). And Watson's intended boundary location is not clear from the record. His plat map provides a distance call of 102 feet and marks the "street" as 42 feet across. His metes and bounds description repeats the 102-foot distance call, but it also identifies the boundary as running along the "road-way."

Holman dismissed Watson's reference to a "road-way" by stating that "if one were to interpret the references to the roadway in the Renne chain of title as being the present, physical roadway, the description would not close by twelve feet more or less. Being familiar with Watson's work, he would not have made that significant a mistake." CP at 23-24. But if Holman's retracement survey was correct, than Watson erred by approximately ten feet in his calculation of the width of the "street," which Holman calculated as 52 feet across.

Holman himself marked a "gravel road" through the middle of the Rineholds' property. CP at 27. The Rennes' GIS expert noted that this "traveled portion" of the roadway was approximately 20 feet wide, both in 1951 and in 2018. CP at 297. Holman acknowledged in his deposition that the term "roadway" could mean "the physical road" or the "areas set aside for the road" and that the meaning of "roadway" depends on context. CP at 189. Watson could have intended either of these alternate meanings of "road-way" in the 1955 deed. At trial, the Rineholds may present Holman's survey and inquire about his expert opinion as to Watson's intent and the location of the boundary. But his expertise does not allow him to usurp the jury's fact-finding role.

At the summary judgment stage, we must consider "the evidence and all reasonable inferences from the evidence in the light most favorable to the

No. 98694-1

nonmoving party." *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015)

(citing *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)).

Applying that standard, the term "road-way" from the 1955 Watson-Johnson deed

could have multiple meanings, at least one of which contradicts the 102-foot

distance call in that same deed. As a result, the Rennes have shown that a genuine

dispute of material fact exists as to Watson's intended boundary location. Thus,

the trial court erred by granting partial summary judgment on that issue.

CONCLUSION

We affirm the Court of Appeals and remand for further proceedings

consistent with this opinion.

No. 98694-1

Gordon McCloud, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.